IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

IN THE MATTER OF:
LEGACY CORPORATION OF ILLINOIS,
OWNER OF THE MV BOONE, FOR THE
EXONERATION FROM OR LIMITATION
OF LIABILITY

     Plaintiff-Petitioner,

 and

AMERICAN COMMERCIAL BARGE
LINE, LLC,

     Claimant.

CASE NO. 21-cv-176-JPG

<u>IN ADMIRALTY</u>

## <u>MEMORANDUM AND ORDER</u>

   This matter comes before the Court on the motion for summary judgment filed by

claimant American Commercial Barge Linc LLC ("ACBL") (Doc. 66).  Plaintiff-petitioner

Legacy Corporation of Illinois ("Legacy") has responded to the motion (Doc. 68).

## I.  Background

   Legacy, owner of the *M/V Boone* ("the *Boone*"), brought this action seeking exoneration

or limitation of liability pursuant to 46 U.S.C. § 30501 *et seq.* in claims connected to the August

12, 2020, sinking and subsequent salvage of the *Boone*.  The *Boone* sank on the Mississippi

River as it was being towed from the Ohio River up the Mississippi River by an ACBL tow boat,

the *M/V David A. Lewi*s *Jr.* ("the *David Lewis*").  A third party's boat, the *M/V Ray A. Eckstein*

("*Ray Eckstein*") hit the sunken Vessel.

   ACBL filed a claim against Legacy for negligence for failing to make the *Boone*

seaworthy and seeks to recover $12,585.01 in expenses it was forced to pay as a result (Claim I)

and for contractual indemnification under the ACBL contract's standard "terms and conditions"

for the costs of its defense and its losses, including claims by the owner of the *Ray Eckstein* (Claim II) (Doc. 57). Legacy, in turn, filed counterclaims against ACBL for breach of a maritime contract for failing to complete the tow with proper care and inspection (Counterclaim I), for bailment damages for failing to return bailed property in the same condition in which it was tendered (Counterclaim II), and for negligence (Counterclaim III) and gross negligence (Counterclaim IV) for failing to protect, inspect and transport the *Boone* with proper care (Doc. 38). Through these claims, Legacy seeks to recover $215,000 in damages. It is on these counterclaims that ACBL seeks summary judgment.

## II.    Summary Judgment Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396. Nevertheless, the "favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (internal quotations and citations omitted).

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial. *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). Where the nonmoving party carries the burden of proof at trial, the moving party may satisfy its burden of production in one of two ways. It may present

2

evidence that affirmatively negates an essential element of the nonmoving party's case, *see* Fed. R. Civ. P. 56(c)(1)(A), or it may point to an absence of evidence to support an essential element of the nonmoving party's case without actually submitting any evidence, *see* Fed. R. Civ. P. 56(c)(1)(B).  *Celotex*, 477 U.S. at 322-25; *Modrowski*, 712 F.3d at 1169.  Where the moving party fails to meet its strict burden, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists.  *Celotex*, 477 U.S. at 322-26; *Anderson*, 477 U.S. at 256-57; *Modrowski*, 712 F.3d at 1168.  A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252.

## III.   Facts

Viewing all evidence and drawing all reasonable inferences in Legacy's favor with respect to the pending summary judgment motion, the evidence establishes the following relevant facts.

Legacy is in the business of site grading, excavation, and dredging, for which it uses towboats and barges.  In 2020, it acquired a used steel hull pushboat—the *Boone*—from Duke Energy, Inc.  Prior to offering to purchase the *Boone*, Legacy's president Blake Enloe personally

inspected it at Duke Energy's facility in Kentucky.  Along with a representative of Duke Energy, Enloe crawled around in the *Boone*'s hull for about 45 minutes making a visual inspection but used no tools or gauges.  He also checked all voids for dryness.  The *Boone* was then taken out on the water for a 45-minute test run so Enloe could see how it handled.  As part of the drive, the *Boone* was pushed against a mooring cell[1] to test its durability under load.  After the test drive, Enloe again crawled around in the hull for 45 minutes conducting another inspection.  He also inspected the outside of the *Boone* by looking over the side of the boat, including an area of the hull above the water line where a fracture was later found, but Enloe saw no fracture.

Before Legacy decided to purchase the *Boone*, Enloe also reviewed a March 5, 2020, survey—the "Blum Survey"—of the boat.  The Blum Survey was conducted while the *Boone* was in the water, not in drydock, so it notes, "The hull condition should be considered as unknown."  Blum Survey 1, Legacy's Resp. Summ. J. Ex. C (Doc. 68-3).  Someone who had run the *Boone* for 20 years also reported to Enloe that he knew of no issues with the boat.

After reviewing all of the foregoing information and within thirty days of his personal inspection, Enloe made an offer by email for Legacy to buy the *Boone* for $20,000.  To justify his apparently low offer, he noted eight items that would need to be done before it would be compliant with the conditions necessary to use it in commercial towing work.  Those items included repairing leaking engine shaft seals on the starboard side and inspecting the hull in drydock with steel gauging.  Duke Energy accepted the offer, and Enloe began to arrange for the *Boone* to be towed to Legacy's home port in Moline, Illinois.

Enloe had hired ACBL to move barges in the past, but not tugboats like the *Boone*.

_____

[1] A mooring cell is "a sheet pile structure, usually filled with earth, stone or concrete, and used to hold barges or other vessels in place."  Law Insider, *Mooring cell definition*, https://www.lawinsider.com/dictionary/mooring-cell (visited Jan. 19, 2023).

Enloe and Travis Graham, from ACBL, agreed by telephone that ACBL would tow the *Boone* down the Ohio River from Kentucky to Cairo, Illinois, and then up the Mississippi River to Moline, for a certain price.  They never signed a written agreement.  Graham followed up on the telephone call with an email to Enloe on July 31, 2020, confirming the booking and stating that it was subject to ACBL's Standard Terms and Conditions for Spot (Tramp) Towing ("T&Cs") and provided a link to the T&Cs on ACBL's website.  The email further provided that Legacy's tender of a vessel for towing would be deemed acceptance of the T&Cs.  The T&Cs included that Legacy warrants that "any vessel tendered for towage will at all times be tight, staunch and in all respects seaworthy and capable of being towed," and further provides that nothing in the T&Cs "shall impose any duty upon ACBL to inspect the vessel or make ACBL liable for damages resulting from failure to make such inspection or resulting from any error in judgment in making the inspection."  T&Cs ¶ 4, ACBL's Mot. Summ. J. Ex. I (Doc. 66-9).  Enloe never looked at the T&Cs on ACBL's website before he tendered the *Boone* for towing.  Enloe never provided Graham any documentation about the *Boone* other than pictures of the boat.

On August 5, 2020, the *M/V Tommy Parish* ("*Tommy Parish*"), an ACBL tug, picked up the *Boone* at Duke Energy's Cincinnati, Ohio, facility and, over six days, towed it on the Ohio River to Cairo.  There, the *Boone* was fleeted[2] with thirty empty barges that ACBL's towboat, the *David Lewis*, would also be transporting north on the Mississippi River.

Lavon Church, the captain of the *David Lewis*, decided to place the *Boone* midship at the starboard (right) side of the tug and securely fastened it to the *David Lewis* with double wiring that was ratcheted tight.  The tug pushed the empty barges in front.  In this position, the *Boone*'s

---

[2] Fleeting refers to "[t]he operation of building or dismantling barge tows."  American Assoc. of Port Authorities, *Glossary of Maritime Terms—fleeting*, https://www.aapa-ports.org/advocating/content.aspx?ItemNumber=21500 (visited Jan. 19, 2023).

bow (forward part) was subject to the "wash" of the water coming out from under the sterns (back end) of the barges the *David Lewis* was pushing.

Several members of the *Tommy Parish* crew informed Church that the *Boone* was "locked down," the hatches were "dogged down" (securely fastened so water could not enter the interior from the deck of the boat), the boat was a "dead boat" (nothing on the boat was running), and there was no way to get to the interior of the boat.  Neither Church nor any of his crew confirmed this.  Instead, while on the boat wiring it to the *David Lewis*, a crew member walked around the *Boone* to look for obvious problems; he saw none.  During the voyage, Church and his crew checked the *Boone* often to see how much of the boat was above the water (the "freeboard") since they knew little about the boat.  Had Church not believed the *Boone* was locked down, his crew would have checked the interior before and during the voyage, especially to determine whether the boat was taking on water and, if necessary, to pump the water out and fix the leak.  In fact, it was later revealed that the boat was not locked down and that there was access to the interior.  Additionally, the engine room doors were closed with padlocks, but the clasps of the locks were open.

While the *David Lewis* and its tow were heading north up the Mississippi River, it was forced to take measures to allow a southbound ship to pass in a restricted channel of the river around Mile Marker 43 near Thebes, Illinois.  This required the *David Lewis* to make an almost 90-degree turn to the side, putting the *Boone* on the leeward side and, according to Church, opposite and protected from the direction the *David Lewis*'s wash would be moving in the turn. When Church was straightening up after making the turn, he felt a bump, and a crew member reported that the *Boone* had broken loose from the wiring and was quickly sinking.

A third boat, the *Ray Eckstein* struck the *Boone* while it was still submerged and before

the U.S. Coast Guard closed the upper Mississippi River.  Legacy retained Okie Moore Diving and Marine to raise the *Boone*.

Two post-incident surveys were conducted of the *Boone*, the "Haynes Survey" on behalf of ACBL and the "Merrill Survey" on behalf of Legacy.  After the *Boone* was raised, water and sand were pumped out of its interior, and a leaky engine shaft was tightened, the *Boone* was able to float.  The Merrill Survey indicated that the *Boone* floated with a 40-degree list to the starboard side and that the list disappeared when sand was removed from the lower engine compartment.  Both surveys noted a 16- to 18-inch horizontal fracture approximately 3/8- to 3/4-inch wide in the hull above the waterline.  The Merrill Survey concluded that the *Boone*'s sinking was caused by the fracture, not leaking shafts, which the Merrill Survey speculated had loosened during the sinking and would have been tightened before the *Boone*'s sale had they been loose earlier.  The Merrill Survey further observed that the fracture did "<u>not</u> appear to be of a recent vintage."  Merrill Survey 6, ACBL's Mot. Summ. J. Ex. G (Doc. 66-7).  The Haynes survey concurred that the fracture "appeared to precede the incident."  Haynes Survey 5, Legacy's Resp. Ex. I (Doc. 68-9).

**IV.    Parties' Positions**

In its pending summary judgment motion, ACBL argues that its T&Cs were part of its towage contract with Legacy and that those T&Cs obligated Legacy to ensure the seaworthiness of the *Boone*, relieved ACBL of any duty to inspect the *Boone*, and obligated Legacy to indemnify ACBL for damages ACBL suffered.  Legacy denies that the T&Cs were terms of its agreement with ACBL because they were proposed after the contract was formed on the telephone without any assent from Legacy or additional consideration to support modification of the oral contract.

7

ACBL also argues that, even if the T&Cs were not part of its contract with Legacy, common maritime law required Legacy to tender the *Boone* in seaworthy condition and to advise ACBL of conditions of the *Boone* that might adversely affect towing safety, but not to require ACBL to do more than make a cursory inspection of the *Boone*.  Legacy contends that ACBL has not established conclusively that the *Boone* was unseaworthy or that ACBL satisfied the implied warranty of workmanlike performance, including the duty to make a reasonable inspection of the tow before undertaking the voyage.  Legacy also contends that even if Legacy were contributorily negligent for failing to detect the fracture to the *Boone*'s hull, ACBL failed to take advantage of the "last clear chance" to avoid an injury by noting before beginning the voyage that the *Boone* was not locked down and was in fact taking on water.

Finally, ACBL argues that, as a matter of law, a tug is not a bailee of the vessel it is towing, so there is no cause of action under a bailment theory for towage contracts.  Legacy contends there is an exception to this general rule where the vessel is connected to a fleeting operation.

## V.    Analysis

ACBL seeks summary judgment on all Legacy's counterclaims.  The Court addresses each in turn.

### A.    Counterclaim I:  Breach of Maritime Contract

Legacy alleges that ACBL breached its contract to tow the *Boone* to Moline with due care, including that it failed to properly inspect the *Boone* while towing it.  In its motion, ACBL takes the position that the T&Cs relieved it of any duty to inspect the *Boone*.  To prevail on summary judgment on Counterclaim I on this theory, ACBL must show that the T&Cs were part of the towage contract.

No party seriously disputes that the towage contract between ACBL and Legacy was a maritime contract governed by general maritime law, not state law. *See Norfolk So. Ry. Co v. Kirby*, 543 U.S. 14, 22-23 (2004). And since state statutes of fraud do not apply, maritime contracts may be oral. *See Kossick v. United Fruit Co.*, 365 U.S. 731, 734 (1961); Thomas J. Schoenbaum, *Admiralty & Maritime Law*, § 10-2 (5th ed. 2012).

Maritime law generally follows the common law of contracts, including the requirement that the parties have reasonable notice of and assent to the terms. *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 269 (5th Cir. 2011). Terms and conditions plainly and clearly set forth on a party's internet site can satisfy this requirement and, accordingly, can be incorporated by reference into a maritime contract even if the other party failed to read or appreciate those terms. *Id.* at 268-69. Additionally, industry custom or prior dealings can also be relevant to interpret a contract. *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 675 n. 6 (2010). Finally, amendments to an existing contract cannot be made without agreement and additional consideration. *Robinson v. Ada S. McKinley Comm't'y Servs.*, 19 F.3d 359, 364 (7th Cir. 1994).

There is a genuine issue of fact about whether the terms of the towage contract between ACBL and Legacy included the T&Cs on ACBL's website. Without any details about the telephone exchange between Enloe and Graham, the Court cannot say as a matter of law whether that exchange, by itself, formed a valid oral contract. If so, the terms of such a contract may have been as simple as Legacy claims they were—a contract to tow the *Boone* with due care in exchange for a payment. Such a contract could not be amended by adding the T&Cs without additional consideration from ACBL.

However, a reasonable factfinder could also conclude that the parties' phone conversation

was simply a preliminary negotiation intended to be subject to a later final agreement that included additional detailed terms and conditions of a type common in the industry. *See* Schoenbaum, *supra* § 9-2 (discussing meeting of the minds on the main terms with details to be decided later). In that case, depending on industry custom and practice, the T&Cs could have been incorporated into the contract whether Enloe looked at them or not.

Construed in Legacy's favor, the submitted evidence does not establish that Legacy agreed to a valid contract that included ACBL's T&Cs. Therefore, the Court cannot grant ACBL summary judgment on Counterclaim I.

B.      Counterclaim II:  Bailment

The Supreme Court has established a bright-line rule that providing towage service does not create a bailment relationship between the tug and the towed vessel. *See Stevens v. The White City,* 285 U.S. 195, 200 (1932). In the absence of a bailment, "a tug's receipt of a tow in good order and delivery in damaged condition raises no presumption of negligence." *Id.* "[T]he owner of the towed vessel bears the initial burden of proving how the fault of the towing vessel damaged its equipment." Joel K. Goldstein, Towage, 31 J. Mar. Law & Com. 335, 336 (2000). *Stevens* allowed no exception for this rule depending on whether the towed vessel was occupied by its own crew or was unmanned. *See Stevens*, 285 U.S. at 201.

Some Courts of Appeals have established exceptions to this general non-bailment rule.[3] *See, e.g., United Barge Co. v. Notre Dame Fleeting & Towing Serv., Inc.*, 568 F.2d 599 (8th Cir. 1978) (exception where towage is in connection with a fleeting operation); *Stegemann v. Miami Beach Boat Slips*, 213 F.2d 561, 564 (5th Cir. 1954) (exception where vessel placed at wharf or

---

[3] Indeed, the non-bailment rule for towage contracts has been subject to well-reasoned criticism. *See, e.g.,* Goldstein, *supra*.

dock).  In those circumstance, the tug becomes a bailee, and if the tow owner proves the vessel being towed was seaworthy when it was tendered, there is a presumption of negligence if the tug returned the tow to its owner in a damaged condition.  *See Stevens*, 285 U.S. at 198; *United Barge*, 568 F.2d at 602 n. 5; *Stegemann*, 213 F.2d at 565.  The tug can overcome that presumption by showing that it exercised reasonable care and that the damage resulted from something other than its own negligence.  *United Barge*, 568 F.2d at 602 n. 5.

The Seventh Circuit Court of Appeals has not established any such exception to the *Stevens* rule.  In fact, it followed *Stevens*' general non-bailment rule and its attendant burden structure in *American Bridge Division, U.S. Steel Corp. v. Roen S.S. Co.*, 328 F.2d 838, 839 (7th Cir. 1964), and the Court has found no indication of any change in its position since then.  District courts within the Seventh Circuit have followed the non-bailment rule as well.  *See, e.g., Riverway Co. v. Spivey Marine & Harbor Serv. Co.*, 598 F. Supp. 909, 911 (S.D. Ill. 1984); *Ispat Inland, Inc. v. Am. Com. Barge Line Co.*, No. 2:99CV58, 2002 WL 32098290, at *13 (N.D. Ind. Sept. 30, 2002); *Lykes Bros. S.S. Co. v. Great Lakes Towing Co.*, 719 F. Supp. 1449, 1457 (E.D. Wis. 1989).  *But see N.M. Paterson & Sons Ltd. v. M/V Ethel E.*, No. 01 C 7325, 2004 WL 2123307, at *7 (N.D. Ill. Sept. 22, 2004), *amended*, 2005 WL 78956 (N.D. Ill. Jan. 12, 2005) (noting *Stevens* but finding exception where tug is actually motive power of a flotilla).

In the absence of any change in the bright-line *Stevens* rule or any exception articulated by the Seventh Circuit Court of Appeals, this Court will follow the *Stevens* rule and hold that Legacy has no claim under a bailment theory.  Accordingly, the Court will grant ACBL's motion for summary judgment on Counterclaim II.  The upshot of this is not that ACBL is absolved from liability for negligence but simply that no presumption of negligence is created under bailment rules by its return of the *Boone* in a damaged condition.  The Court now turns to the

question of negligence.

        D.     <u>Counts III and IV:  Negligence and Gross Negligence</u>

In Counterclaims III and IV, Legacy asserts that ACBL was negligent or grossly negligent in performing its obligation to transport the *Boone* to Moline.  The starting point for any negligence inquiry is in ascertaining the duty owed, if any.

Under maritime law, a tug owes the owner of its tow "the duty to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service." *Stevens v. The White City*, 285 U.S. 195, 202 (1932).  As part of this duty of ordinary care, the tug must "act and avoid, so far as reasonable care and skill can afford, dangerous points in navigation that are known or should have been known to a master in charge of the tug," and tug operators "are not to be charged with negligence unless they make a decision which nautical experience and good seamanship would condemn as unjustifiable at the time and under the circumstances shown." *N.M. Paterson & Sons Ltd. v. M/V Ethel E.*, No. 01 C 7325, 2004 WL 2123307, at *7 (N.D. Ill. Sept. 22, 2004) (internal citations and quotations omitted), *amended*, 2005 WL 78956 (N.D. Ill. Jan. 12, 2005).

Additionally, the tug operator's duty to exercise reasonable care includes the duty to notice obvious conditions of unseaworthiness in the towed vessel, but he need not conduct a detailed inspection.  *Ark. State Highway Comm'n v. Ark. River Co.*, 271 F.3d 753, 760 (8th Cir. 2001).  What kind of inspection is required depends on the circumstances.  *Id.*

It is the tow owner's burden to show that its loss was caused by the tug's breach of its duty.  *Stevens*, 285 U.S. at 202; *Am. Bridge Div., U.S. Steel Corp. v. Roen S.S. Co.*, 216 F. Supp. 353, 359 (E.D. Wis. 1963), *aff'd,* 328 F.2d 838 (7th Cir. 1964).  If the tug's operator was negligent, the tug will be liable for all damages caused to the tow owner by its failure to satisfy

12

that duty.

On the other hand, the owner of a towed vessel has a common law duty to ensure the vessel is "'sufficiently staunch and strong to withstand the ordinary perils to be encountered on the voyage.'" *Ark. State Highway Comm'n*, 271 F.3d at 760 (quoting *Shebby Dredging Co. v. Smith Bros., Inc.,* 469 F. Supp. 1279, 1284 (D. Md. 1979)).  This includes the duty to provide a structurally sound vessel as well as "to prepare the vessel, including its appurtenances, in such a way that the tug operator will be able to successfully negotiate the conditions and obstacles that the tow will encounter." *Ark. State Highway Comm'n*, 271 F.3d at 760.  Whether a tow satisfies this standard in any particular situation is judged "by reference to the vessel's intended voyage, the hazards likely to be encountered, and the vessel's ability to withstand these hazards." *Am. Home Assur. Co. v. L & L Marine Serv., Inc.,* 875 F.2d 1351, 1354 (8th Cir. 1989); *accord Ark. State Highway Comm'n*, 271 F.3d at 760.  Nevertheless, the party claiming a vessel is unseaworthy has the burden of proving that fact.  *Shebby Dredging*, 469 F. Supp. at 1284.  There is a presumption that a vessel is unseaworthy when it sinks under normal conditions in the absence of improper handling.  *Id.*

In light of these respective duties of the parties and the lack of any definitive conclusion about the pre-voyage condition and the sinking of the *Boone*, there are genuine issues of material fact preventing summary judgment.  For example, there is a genuine issue of fact regarding whether the *Boone* was unseaworthy for being towed on a river along with a fleet of barges.  There is a dispute of fact about whether the fracture even existed when Legacy tendered the *Boone* to ACBL for towing.  Enloe did not see the fracture—which was approximately 16 inches long and 3/8- to 3/4-inch wide and above the waterline—after a visual inspection, yet the post-accident surveys indicated the fracture had been there for a while.  By the same token, Enloe

13

noted leaking engine shafts in his pre-purchase inspection, and the Merrill survey noted that when the shafts were tightened, the *Boone* floated.  Leaking shafts and a hull fracture could call into question for a reasonable factfinder whether the *Boone* was unseaworthy for being towed by the *David Lewis* on a river where it might be necessary to make sharp turns to avoid oncoming ship traffic.

There is also a genuine issue of fact regarding whether Church and his crew exercised reasonable care and maritime skill in towing the *Boone* and whether they made a reasonable inspection of the *Boone* before beginning the voyage.  A reasonable factfinder could conclude that Church made sufficient inquiries about the *Boone* before beginning to tow it.  However, while the *David Lewis*'s crew fastened the *Boone* securely to the *David Lewis* and inspected the *Boone* on a regular basis before and during the towing, they did not even attempt to gain access to inspect the inside of the boat, an inspection Church admits should have been done if possible. A reasonable factfinder could also find Church fell short of his duty of care by failing to note a fracture in the hull—if it even existed at the time.

To the extent Enloe faults Church for improvidently exercising the turning maneuver and causing the wash to sink the *Boone*, that theory is pure speculation based on hearsay rather than personal knowledge or expertise, so it does not support an inference that wash caused the sinking.  Additionally, Church testified that wash from the maneuver was not sent to the side on which the *Boone* was attached and that the *Boone* was protected from wash from the turn.  To the extent the wash contributed to the sinking, it may have been only because the *Boone* was not seaworthy for such a hazard.

Stepping back to look at the big picture, there is a genuine issue of fact about the cause of the *Boone*'s sinking.  Because a reasonable factfinder could conclude that the *Boone* was

14

unseaworthy for a river voyage that could require sharp turns, it could find Legacy liable for tendering an unseaworthy vessel.  On the other hand, and more important to the pending summary judgment motion, a reasonable factfinder could also conclude that Church's failure to spot the fracture and failure to verify the inside of the *Boone* was inaccessible did not constitute a reasonable pre-voyage inspection.  In that case, the factfinder could hold ACBL responsible.

In sum, with so many genuine issues of material fact, a dearth of evidence about what is customary in the industry or reasonable in these maritime circumstances, and so much speculation about the condition of the *Boone* and the cause of its sinking, the Court simply cannot say ACBL is entitled to summary judgment on Legacy's negligence and gross negligence counterclaims.  Further, it appears that the resolution of these claims will depend on a set of maritime law presumptions with which the Court is not used to applying.  Before trial, the parties should submit trial briefs of no more than ten pages clarifying their positions on the legal presumptions and burdens of proof on the various negligence issues in this case.

One final word is merited about Legacy's theory that ACBL breached an implied duty of workmanlike performance.  While technically such a theory is a contract action, the relevant inquiries echo those of a negligence action.  For the same reason the Court found ACBL is not entitled to summary judgment on Legacy's negligence and gross negligence claims, it also finds it is not entitled to summary judgment on a breach of implied warranty of workmanlike performance theory.

## VI.     Conclusion

For the foregoing reasons, the Court:

- **GRANTS in part** and **DENIES in part** ACBL's motion for summary judgment (Doc. 66).  The motion is **GRANTED** to the extent it seeks summary judgment on Legacy's bailment counterclaim (Counterclaim II).  The motion is **DENIED** in all other respects;

- **ORDERS** that at or before the Final Pretrial Conference, each party shall submit a trial brief, not to exceed ten pages, clarifying its position on the legal presumptions and burdens of proof on the various liability issues in this case; and

- **DIRECTS** the Clerk of Court to enter judgment accordingly at the close of the case.

**IT IS SO ORDERED.**
**Dated:  February 17, 2023**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**